**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TROY HAMMOND,** | : | **Civil No. 3:23-CV-00998** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **LELAND DUDEK,** | : | |
| **Acting Commissioner of Social Security,**[1] | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

I.    **Introduction**

In the instant Social Security appeal, the parties present opposing views on how this Court should interpret the administrative law judge's (ALJ) evaluation of the medical opinion evidence under the post-March 2017 Social Security regulations. On this score, while prior to March 2017, ALJs were required to follow regulations that defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy, ALJs are

---

[1] Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for the previously named defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

now required to consider a broad range of opinions and have been enjoined to engage in a more holistic analysis of the medical opinions over a strict hierarchical approach. In this case the ALJ was presented with the opinions of two State agency medical consultants, a consultative examination report and opinion by orthopedist Dr. Kneifati, and a functional assessment completed by Hammond's Occupational Therapist Jennifer L. Small. The opinion of OTRL Small included a detailed functional capacity assessment along with a recommendation that Hammond refrain from seeking employment at the time because he did not demonstrate the necessary sitting to tolerate a sedentary position or standing tolerance to perform a light position. Without considering the detailed functional analysis performed by Ms. Small based upon her examination of the plaintiff, the ALJ summarily rejected her opinion stating, "this evidence is inherently neither valuable nor persuasive because it speaks to an issue reserved to the Commissioner." (Tr. 24).

This single-sentence rejection of a detailed medical source opinion was improper. Indeed, both the reason stated by the ALJ in the decision and the Commissioner's alternative argument in response to this appeal run afoul of the regulations which require:

> When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993). The

> ALJ must consider all the evidence and give some reason for discounting the evidence she rejects. See Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir.1983).

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).

The ALJ rejected this opinion seemingly for no reason related to its content or merits, singly focusing on Ms. Small's recommendation that he refrain from work rather than considering the detailed and specific functional assessment completed following her examination of the plaintiff. Moreover, the Commissioner's fresh argument that the ALJ was not required to evaluate this opinion because Ms. Small is not a medical source is "the wrong reason," since the new regulations cast broadly and require an ALJ to consider the opinions of an occupational therapist under the same framework as other medical sources. Thus, while the Commissioner spends much time explaining why, under this new paradigm, the ALJ's evaluation of the medical opinion was proper, we conclude that the ALJ's burden of articulation has not been met in this case since the ALJ's decision rejects the opinions of a treating source "for no reason or for the wrong reason." Id. Accordingly, we will remand this case for further consideration and evaluation of the medical opinion evidence.

## II.    **Statement of Facts and of the Case**

This is the plaintiff, Troy Hammond's, second application for disability and supplemental security income. He previously applied for benefits on August 28,

2018, and his claim was denied by an ALJ on February 6, 2020. (Tr. 76-92). His appeal was denied by the Appeals Council on July 10, 2020. (Tr. 93-98). On September 25, 2020, Troy Hammond filed new applications for disability and supplemental security income benefits alleging an onset of disability beginning January 12, 2018. (Tr. 12). According to Hammond, he was disabled due to a combination of physical and mental impairments including hernia surgery, osteoarthritis of the left hip, severed left leg nerve, L4 disc in back, depression, constant pain, and anxiety. (Tr. 100). Hammond was born on November 15, 1967, and was 50 years old at the time of the alleged onset of his disability, making him an individual closely approaching advanced age under the regulations. (Tr. 99). He previously worked as a tractor trailer driver and in construction. (Tr. 68).

Hammond's appeal focuses on the ALJ's evaluation of the medical opinion evidence, specifically with regard to his tolerance for sitting, standing, and walking, accordingly we will focus our review of the record on Hammond's physical impairments in this realm. The ALJ aptly summarized the medical record as follows:

> On March 12, 2020, the claimant was seen for follow-up for left groin pain (Exh. B8F/2). The claimant was assessed with symptomatic left inguinal pain. The claimant was diagnosed with left inguinal pain and umbilical hernia without obstruction and without gangrene. A physical examination showed no inguinal hernia noted (Exh. B8F/2). It was noted that the claimant had had prior abdomen surgery, in 2007 and that he had a left inguinal hernia repair (Exh. B8F/3). For treatment it was

4

recommended that the claimant get intervention pain management injection to the different nerves, and if the pain was relieved, the doctor recommended a neurectomy (Exh. B8F/3).

On March 19, 2020, the claimant was seen for follow up for left groin pain (Exh. B8F/9). It was noted that an opinion was rendered for symptomatic left groin pain status post hernia repair with mesh from 2007 by another provider. The claimant had had left inguinal hernia with Prolite mesh, to the inguinal floor with medium weight polypropylene secured with prolene. The claimant was diagnosed with left inguinal pain and obesity (BMI 30-30.9) (Exh. B8F/9). For treatment the claimant would be scheduled for open inguinal exploration with excision of mesh and placement of Q pain pump, possible neurectomy (Exh. B8F/10).

On November 5, 2020, the claimant had a follow up appointment for his left groin pain (Exh. B8F/35). It was noted that he continued to have left lower quadrant pain and left groin pain and he stated that he had been having tingling/numbness down his left leg (Exh. B8F/36). During the appointment it was noted that the claimant was five feet eleven inches tall, and he weighed 233 pounds and his Body Mass Index (BMI) of 32.5 (Exh. B8F/38). During the physical examination, it was noted that the claimant appeared normal and well developed (Exh. B8F/38). Examination of his abdomen showed left lower quadrant pain and left inguinal pain and during the musculoskeletal examination he had numbness in his left leg (Exh. B8F/39). The claimant stated that his groin pain was mostly gone, but his remaining pain radiated down his leg. The claimant was to see ortho/spine specialist and it was recommended that he also see his primary care physician as well (Exh. B8F/35).

On April 22, 2019, the claimant was given a physical therapy order due to his diagnosis of unilateral primary osteoarthritis, left hip (Exh. B2F/49). The claimant was to attend physical therapy three times a week, for the next 30 days (Exh. B2F/49).

On May 2, 2019, the claimant was seen for physical therapy after being diagnosed with unilateral primary osteoarthritis, left hip and pain in his left hip (Exh. B2F/2). The claimant stated that his left hip pain had begun in 2015. He stated that his symptoms arose in his thigh and groin as well. He reported that he had "pins and needles in his left lower leg as well". He reported that getting in and out of car increased his symptoms, along with showering. He stated that walking might increase his pain as well. It was noted that at that time, the claimant was unable to walk, perform stair negotiation and return to daily tasks pain free (Exh. B2F/2). For treatment, it was recommended that the claimant attend physical therapy three times a week for four weeks (Exh. B2F/3, 4).

On February 6, 2020, the claimant was seen for low back and hip pain (Exh. B19F/2). The claimant stated that his left low back pain was still doing well after his SI joint injection. Interestingly his left lateral hip pain was 50 percent improved following the ilioinguinal nerve block. However, it had no change on his left groin or anterior hip pain. He had sharp pain along the left anterior thigh to about mid-thigh level. He mentioned in the past he had numbness in his left anterolateral thigh and lateral thigh to mid-thigh level. He stated that his left hip and upper thigh could feel weak with standing or walking (Exh. B19F/2).

It was noted that the claimant was seen at WellSpan Ortho in 2017, for left groin pain, which was felt to be more consistent with hernia rather than hip pathology. A hip injection was ordered at that time, which did not help (Exh. B19F/2). Past treatment had included physical therapy, which was not helpful, and made him feel worse (Exh. B19F/3). X-rays of his left hip on December 13, 2016, were unremarkable. On September 3, 2015, the claimant had an MRI completed on his left hip and the results showed no acute osseous or soft tissue abnormality. The results also showed acetabular over coverage of the femur, with prominent spurring predominantly of the posterior wall of the acetabulum. Changes could be present in the clinical context of posterior femoroacetabular impingement. There was no displaced hip labral tear and there was limited labral evaluation given lack of fluid distention of the hip. Interventions included on December 18, 2019, left

ilioinguinal nerve block; November 6, 2019, left SI joint injection, left low back pain was resolved and January 27, 2017, intra-articular left hip injection, no change, not even temporarily (Exh. B19F/3).

During the physical examination it was noted that the claimant weighed 238 pounds and his BMI was 34.18 (Exh. B19F/6). It was noted that the claimant was in no acute distress, and he ambulated with a slight antalgic gait. Examination of his left hip showed that his trochanteric bursa was not tender. He reproduced popping noises by actively ranging his hip. His manual motor testing of lower extremities was normal. The claimant was diagnosed with left hip pain and sacroiliitis (Exh. B19F/6). He was offered hip surgery by a practice called OIP outside of WellSpan in the past and the claimant stated he would follow up as needed (Exh. B19F/7).

On March 12, 2020, the claimant had a CT scan completed on his abdomen and pelvis due to a history of unspecified abdominal pain (Exh. B8F/6). It was also noted that he had had prior hernia repair surgery with mesh (Exh. B8F/6). The results showed some multifocal osteoarthritic degenerative changes involving the skeleton were present, including relatively symmetrical at least mild bilateral osteoarthritis of the hips (Exh. B8F/7).

On September 17, 2021, the claimant had x-rays completed on his back due to acquired deformity of pelvis (Exh. B15F/3). The results were compared with previous lumbar spine images dated June 21, 2017. The results showed that there was no measurable scoliosis. There was multilevel spondylosis with intermittent bridging throughout the thoracic and lumbar spines. There were no compression deformities (Exh. B15F/3).

On December 8, 2021, the claimant had a Functional Capacity Evaluation (FCE) completed (Exh. B21F/2). It was noted that after his hernia surgery in 2007, the claimant had returned to work and he began having neck, back, hips, legs, shoulders, groin pain, neuropathies bilateral lower extremities, as well as some fecal incontinence (Exh. B21F/5). The claimant had undergone corrective surgery for his hernia

in 2020 which improved his left leg pain (Exh. B21F/5, 6). He had participated in the following treatments to manage his injury/symptoms, chiropractic care, stretching, medication, heat, ice, injections and physical therapy. His medications included Citalopram, Diclofenac, Gabapentin, Hydrochlorothiazide, Naproxen and Trazadone. He was also taking over-the-counter Aleve and Tylenol (Exh. B21F/6).

The claimant reported difficulty with rolling and getting in/out of bed, getting in and out of chairs, getting in and out of cars, walking on even surfaces, walking on uneven terrain, climbing stairs, bathing, dressing, grooming, toileting, household chores, shopping, driving/transportation, care of dependents and work (Exh. B21F/7). However, the claimant also stated that at that time he was exercising, and he performed stretches and walked around the block (Exh. B21F/7). During the physical examination it was noted that the claimant's posture showed that he had had forward head, rounded shoulder and increased lordosis (Exh. B21F/10). As for his gait pattern, he had a decreased stride length, decreased trunk rotation, decreased arm swing, and decreased weightbearing through left lower extremity. As for his range of motion, his upper extremities were within functional limits; his lower extremities were within functional limits; cervical spine within functional limits; his lumbar spine was within functional limits. His strength in both his upper and lower extremities was within functional limits (Exh. B21F/10).

During the functional evaluation it was determined that the claimant could occasionally lift and carry 30 pounds (Exh. B21F/3, 4). He could frequently sit and stand, and he could occasionally walk and climb stairs (Exh. B21F/4). He should avoid climbing ladders and he could occasionally bend (Exh. B21F/4). He could occasionally stoop, and squat and he should avoid crouching, kneeling and crawling (Exh. B21F/5). The doctor indicated that based on the results of the evaluation, it was recommended that the claimant refrain from seeking employment at that time (Exh. B21F/2). The doctor indicated that the claimant did not demonstrate the necessary sitting to tolerate a sedentary position due to his frequent changes in position nor did he

8

tolerate the standing tolerance to perform in a light level position (Exh. B21F/2).

On January 12, 2022, the claimant had an annual physical examination completed (Exh. B22F/7). The claimant denied any acute concerns or chronic complaints beyond necessity for his annual physical examination (Exh. B22F/8). The claimant denied chest pain, shortness of breath, abdominal pain, nausea, vomiting or diarrhea, fever, cough, unintentional changes in weight or loss of appetite (Exh. B22F/9). During the physical examination, it was noted that the claimant was in no acute distress and his abdomen was soft and nontender. During the musculoskeletal examination the claimant had a steady gait with a normal station, and he had normal range of motion in his cervical spine. It was noted that he weighed 231 pounds and his BMI was 33.62 (Exh. B22F/9). The claimant was diagnosed with annual physical exam, BMI 33.0-33.9, adult and chronic bilateral lower back pain with left-sided sciatica (Exh. B22F/8). His conditions were assessed to be stable based on his symptoms and exam. He was to follow up in six months for ongoing management of his chronic conditions (Exh. B22F/8).

(Tr. 19-22).

In addition to the longitudinal medical records, several medical sources opined upon Hammond's ability to perform work-related activities. Two State agency consultants who considered Hammond's claim concluded he was capable of performing light work. On April 23, 2021, State agency consultant Dr. Hong Sik Park completed a residual functional capacity assessment of Hammond based upon a review of his medical records. Dr. Park opined that Hammond could occasionally lift and/or carry twenty pounds, could frequently lift and/or carry ten pounds, could stand and/or walk for a total of six hours and could sit for a total of six hours in an

eight-hour workday. (Tr. 113). Dr. Park further opined that Hammond could frequently balance, occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl, but never climb ladders/ropes/scaffolds, and that he should avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. 114-15). State agency consultant Dr. Karel Ann Keiter's RFC assessment on reconsideration in October 2021 echoed the limitations opined by Dr. Park, concluding that Hammond could stand and/or walk for a total of six hours and could sit for a total of six hours in an eight-hour workday, along with the other postural and environmental limitations previously determined. (Tr. 165-68).

The two opinions of the non-examining consultants were cast against two examining source opinions which were much more restrictive with regard to Hammond's ability to sit, stand, and walk. For example, on April 14, 2021, consultative examiner Dr. Ahmed Kneifati completed an RFC assessment of Hammond after examining the plaintiff and opined that Hammond would only be capable of standing for a total of three hours, walking for a total of two hours, and sitting for a total of four hours in an eight-hour workday. (Tr. 778). Dr. Kneifati also opined that Hammond could only occasionally lift and carry up to twenty pounds, but never more than twenty pounds, (Tr. 777), could occasionally balance, stoop, and climb stairs, ramps, ladders, and scaffolds, and frequently kneel crouch and

crawl, (Tr. 780), and could only occasionally be exposed to a variety of environmental hazards. (Tr. 781).

Finally, on December 8, 2021, Jennifer Small, OTRL, completed a functional capacity evaluation of Hammond. Although OTRL Small's evaluation indicates he would tolerate "frequent" sitting and standing, her notes state that Hammond tolerated sitting for a total of seventy minutes total, with the longest duration being thirty minutes after which point he did not sit greater than sixteen minutes without standing to change his position. (Tr. 950). OTRL Small also noted that Hammond tolerated standing for a total of seventy minutes, with the longest duration being nineteen minutes and that he could tolerate only occasional walking based upon her examination. (Id.) OTRL Small also opined that Hammond could occasionally lift and carry up to thirty pounds, could occasionally climb stairs, bend, stoop, and squat, but should never climb ladders, crouch, kneel, or crawl. (Tr. 950-51). In her summary of findings, OTRL Small stated that Hammond was functioning in the below sedentary work category and recommended he refrain from seeking employment at that time since he did not demonstrate the necessary sitting to tolerate a sedentary position due to frequent changes in position nor did he tolerate the standing tolerance to perform in a light level position. (Tr. 948-49).

11

It was against this clinical backdrop that an ALJ conducted a hearing regarding Hammond's disability application on April 14, 2022, at which Hammond and a vocational expert testified. (Tr. 33-75). At the hearing, Hammond testified that, due to hip and back pain, he can stand for only fifteen to twenty minutes before having to sit and can sit for another fifteen to twenty minutes before having to reposition himself. (Tr. 54). He elaborated that he has to rotate between sitting and standing throughout the day because both are uncomfortable, and he is most comfortable in a reclining position. (Tr. 54, 62). He also testified that he could walk one block before needing to rest. (Tr. 55).

At the hearing, the ALJ posed hypotheticals to the vocational expert, who was able to identify light work positions the plaintiff could perform if he could sit for up to six hours and stand and/or walk for up to four hours total in an eight-hour workday, with additional postural limitations. (Tr. 69-70). Upon examination by the plaintiff's attorney, the vocational expert testified that the light work positions identified based upon the ALJ's hypotheticals could accommodate a sit/stand option, but that a requirement to change positions every fifteen minutes would lead to the claimant being off-task more than fifteen percent of the day which would preclude competitive employment. (Tr. 70-71).

Following this hearing, on May 3, 2022, the ALJ issued a decision denying Hammond's application for benefits. (Tr. 9-32). In that decision, the ALJ first concluded that Hammond met the insured status requirements of the Social Security Act through September 30, 2021 and had not engaged in substantial gainful activity since January 12, 2018, the alleged onset date. (Tr. 14). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Hammond suffered from the following severe impairments: hernia – status post repair, mild osteoarthritis in bilateral hips, thoracic spine and lumbar spine degenerative disc disease spondylosis, and obesity. (Tr. 15). At Step 3 the ALJ determined that Hammond did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 17-18).

The ALJ then fashioned the following RFC for the plaintiff:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequently balancing; occasionally climbing ramps and stairs; occasionally stooping, kneeling, crouching and crawling; never climbing ladders, ropes or scaffolds; need to avoid concentrated exposure to extreme cold, vibration, and hazards, such as unprotected machinery and unprotected heights.

(Tr. 18).

In reaching this conclusion, the ALJ considered the longitudinal medical records, along with the medical opinion evidence, cast against Hammond's statements regarding the limiting effects of his impairments. In considering the medical opinion evidence, the ALJ adopted the opinions of the non-examining State agency consultants who opined that Hammond would be capable of light work, stating that they were consistent with the prior administrative medical findings and supported by the medical evidence of record. (Tr. 22-23). The ALJ found the opinion of Dr. Kneifati, that Hammond could sit for four hours, stand for three hours, and walk for two hours in an eight-hour workday partially persuasive but adopted a less restrictive RFC finding his opinion only partially consistent with his examination and the record and citing to Dr. Kneifati's observation that Hammond could perform activities of daily living. (Tr. 23).

The ALJ also considered a Neck Disability Index score submitted by Hammond's treating physiatrist, finding it not persuasive because it relied heavily on the subjective report of symptoms, and a chiropractic progress note submitted by his treating chiropractor, Dr. Kevin Jackson stating that Hammond was not responding well to care and referring him for pain management, which she found partially persuasive. (Tr. 24). The ALJ considered these medical notes in the record to be medical opinion evidence which was analyzed for its persuasiveness.

14

However, despite considering brief treatment notes from treating sources such as Hammond's physiatrist and chiropractor to be relevant medical opinion evidence, the ALJ inexplicably summarily rejected the opinion of OTRL Small without considering the persuasiveness of her residual functional assessment. The ALJ noted simply:

> Jennifer L. Small, an Occupational Therapist, Registered, Licensed (OTRL), completed a Functional Capacity Evaluation on the claimant on December 8, 2021 (Exh. B21F/2). After the examination, Ms. Small recommended that the claimant refrain from seeking employment at that time because he did not demonstrate the necessary sitting to tolerate a sedentary position due to frequent changes in position and he did not tolerate the standing tolerance to perform a light level position (Exh. B21F/2). However, under 20 CFR 404.1520b(c)(1) and (3) and 416.920b(c)(1) and (3)), this evidence is inherently neither valuable nor persuasive because it speaks to an issue reserved to the Commissioner.

(Tr. 24). This conclusion focused on the one-sentence recommendation in OTRL Small's Functional Capacity Evaluation, but ignored the balance of the detailed evaluation which provided an opinion regarding Hammond's functional abilities, including his ability to sit, stand, and walk.

The ALJ then found that Hammond could not perform his past work but retained the capacity to perform other jobs that existed in significant numbers in the national economy. (Tr. 25-27). Having reached these conclusions, the ALJ

15

determined that Hammond had not met the demanding showing necessary to sustain his claim for benefits and denied this claim. (Tr. 27).

This appeal followed. (Doc. 1). On appeal, Hammond argues that, among other errors, the ALJ failed to adequately consider the opinion of Jennifer L. Small regarding his ability to sit, stand, and walk. We agree, since in our view the ALJ's responsibility of adequately articulating the basis for a medical opinion evaluation has not been met in this this case. Therefore, we will remand this case for further consideration and evaluation of the medical opinion evidence.

## III.    Discussion

### A.    Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.

16

Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993).  But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are

enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and

(5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D.

Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller, 962 F.Supp.2d at 778–79 (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal

requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony

regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis

24

for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.    Legal Benchmarks for the ALJ's Assessment of Medical Opinions

Hammond filed his disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations that defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court has aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency;

25

relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

26

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at
*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.
Judicial review of this aspect of ALJ decision-making is still guided by several
settled legal tenets. First, when presented with a disputed factual record, it is well
established that "[t]he ALJ – not treating or examining physicians or State agency
consultants – must make the ultimate disability and RFC determinations." Chandler
v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating
medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence
for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d
Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision
is accompanied by an adequate, articulated rationale, it is the province and the duty
of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without
crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–
00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
"SSR 96–2p does not prohibit the ALJ from crediting some parts of a
treating source's opinion and rejecting other portions"); Connors v.
Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
10, 2011). It follows that an ALJ can give partial credit to all medical

> opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

Finally, with respect to assessing competing medical opinion evidence, it is clear beyond peradventure that:

> When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects. See Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir.1983).

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).

It is against these legal benchmarks that we assess the instant appeal.

### D.    **This Case Should Be Remanded for Further Consideration of the Medical Opinion Evidence.**

This case illustrates the obligation of the ALJ to "consider all the evidence and give some reason for discounting the evidence she rejects." Plummer, 186 F.3d at 429. As previously explained, under the new regulations, "the ALJ must [ ] articulate how [he or she] considered the medical opinions and how persuasive [he or she] find[s] all of the medical opinions." Andrew G., 2020 WL 5848776 at *5. Here, OTRL Jennifer Small completed a functional evaluation which included both an examination and her opinion regarding Hammond's functional abilities in a

variety of categories, including his ability to sit, stand, walk, and perform an array of postural activities. (Tr. 948-956). Although the ALJ summarized the examination findings and opinion of OTRL Small in the RFC assessment, the ALJ discounted OTRL Small's opinion when evaluating the medical opinion evidence and did not explain or articulate how persuasive she found Small's opinion, despite assessing the persuasiveness of every other medical opinion, including treatment notes that do not appear to be opinions at all like the Neck Disability Index provided by Hammond's treating physiatrist and a progress note from his treating chiropractor stating he was not responding well to care and referring him to pain management. Yet, inexplicably, when the ALJ turned to the opinion of OTRL Small, she dismissed her opinion completely as "evidence [that] is neither valuable nor persuasive because it speak to an issue reserved to the Commissioner" under 20 CFR 404.1520b(c)(1) and (3) and 416.920b(c)(1) and (3). (Tr. 24). In doing so, the ALJ referenced a single statement in the extensive evaluation, which recommended Hammond refrain from seeking employment at that time because he did not demonstrate the necessary sitting to tolerate a sedentary position due to frequent changes in position and did not tolerate the standing tolerance to perform a light level position, but discounted the balance of the evaluation which she had previously summarized. This was error.

While it is true that, "[u]nder the new regulations, a statement from a physician that the claimant is disabled does not require analysis by the ALJ, as such a determination is reserved for the ALJ," opinions "comprised of more than just a disability statement . . . require[ ] some assessment by the ALJ." Schnoke v. O'Malley, No. 3:23-CV-281, 2024 WL 3046715, at *15 (M.D. Pa. June 18, 2024) (citing 20 C.F.R. §§ 404.1520b(c), 416.920b(c)). Indeed, as the plaintiff points out, the Social Security Administration, Program Operations Manual System (POMS),[2] provides guidance on the articulation requirements which govern the evaluation of a statement on an issue reserved for the commissioner and state that, for claims filed on or after March 27, 2017:

> When a document from a source contains multiple categories of evidence, consider each kind of evidence according to its applicable rules. Do not consider an entire document to be a statement on an issue to the Commissioner simply because the document contains a statement on an issue that is reserved to the Commissioner.

---

[2] "[T]he Social Security Administration's Program Operations Manual System ['POMS'], [are] the publicly available operating instructions for processing Social Security claims. While these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect." Antal v. Berryhill, No. 3:17-CV-2097, 2018 WL 4038147, at *4 (M.D. Pa. July 26, 2018), report and recommendation adopted, No. CV 3:17-2097, 2018 WL 4030694 (M.D. Pa. Aug. 23, 2018) (quoting Artz v. Barnhart, 330 F.3d 170, 176 (3d Cir. 2003)).

SSA, Program Operations Manual (POMS) DI 24503.040, Evaluating a Statement

on an Issue Reserved to the Commissioner,

https://secure.ssa.gov/poms.nsf/lnx/0424503040 (March 2017).

Moreover, to the extent that the Commissioner argues OTRL Small's

assessment was not a medical opinion under the regulations,

> A medical opinion is a statement from a medical source about what you
> can still do despite your impairment(s) and whether you have one or
> more impairment-related limitations or restrictions in the following
> abilities:
> . . .
> > (i) Your ability to perform physical demands of work
> > activities, such as sitting, standing, walking, lifting,
> > carrying, pushing, pulling, or other physical functions
> > (including manipulative or postural functions, such as
> > reaching, handling, stooping, or crouching)

20 C.F.R. § 404.1513(a)(2). OTRL Small's assessment, which spans multiple pages

and includes examination findings and an assessment of Hammond's physical

abilities, including his ability to sit, stand, walk, carry, push, pull, and lift, is

undeniably a medical opinion and contained more than just a statement reserved for

the Commissioner. Thus, the ALJ rejection of this decision without explaining how

she considered its supportability and consistency and evaluating its persuasiveness

was clear error. See e.g. Fuller v. Kijakazi, No. EP22CV00133FMMAT, 2023 WL

5807867, at *4 (W.D. Tex. Aug. 22, 2023), report and recommendation adopted, No.

EP22CV00133FMMAT, 2023 WL 5811852 (W.D. Tex. Sept. 7, 2023) ("[G]eneral conclusions that answer the ultimate questions left to the Commissioner as to whether one is disabled or able to work are not evidence that need to be discussed in the ALJ's decision, while statements about how specific impairments affect work-related abilities, which inform the Commissioner's ultimate legal conclusions, must be addressed").

The Commissioner does not address this argument directly, but instead argues that the ALJ was not required to assess the opinion of OTRL Small because she is not a "medical source" under 20 C.F.R. § 404.1502. (Doc. 13, at 23). This argument fails for at least two reasons. First, the new regulations substantially broadened the range of opinions that ALJs were enjoined to consider in their analysis. Thus, while the regulations define who is an "acceptable medical source," including licensed physicians, psychologists, and physician assistants, 20 C.F.R. § 404.1502(a), the regulations still require an ALJ to consider the opinions of not acceptable medical sources using the same framework, evaluating their persuasiveness based upon the most important factors of supportability and consistency. 20 C.F.R. § 416.927(f)(1). See Gill v. O'Malley, No. CV 23-165, 2024 WL 896386, at *5 (W.D. Pa. Feb. 29, 2024) (remanding where an ALJ failed to analyze the persuasiveness of the opinion of an occupational therapist based upon the factors delineated by the regulations);

Geer v. Comm'r of Soc. Sec., No. 3:23-CV-00009-JJH, 2023 WL 9268483, at *14 (N.D. Ohio Nov. 20, 2023), report and recommendation adopted, No. 3:23-CV-9, 2023 WL 9270498 (N.D. Ohio Dec. 7, 2023) (Finding an occupational therapist "is a 'medical source' whose medical opinion must be considered under the framework of the new regulations"). Accordingly, the ALJ was required to address and analyze the opinion of OTRL Small despite her not being an "acceptable medical source" under the regulations.

Second, nothing in the ALJ's decision indicates that the ALJ did not credit OTRL Small as a medical source. In fact, the ALJ refers to Small as "the doctor" when summarizing her functional evaluation during the RFC assessment. (Tr. 22). Moreover, the ALJ addressed the persuasiveness of much less thorough treatment notes by other not acceptable medical sources under 20 C.F.R. § 404.1502, including Hammond's treating chiropractor and physiatrist. (Tr. 24). Thus, not only is this argument belied by the plain language of the ALJ's own decision, which clearly stated the evaluation was rejected because it speaks to an issue reserved for the Commissioner, but it is simply not supported by the balance of the opinion which credits other, similar, sources but inexplicably rejects OTRL Small's opinion without proper explanation.

Finally, this error was not harmless where Small's opinion, while at times confusing and inconsistent, supported Hammond's testimony that he was unable to sit for longer than fifteen to thirty-minute intervals, a rate at which the vocational expert testified would preclude him from competitive work. (Tr. 70-71).

In sum, under the regulations governing evaluation of medical opinion evidence, more is needed by way of explanation in this case. Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.    <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: February 27, 2025